UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -v.- | : | 10 Cr. 1303 (SAS) |
| MAMADU KAMARA, | : | |
| Defendant. | : | |

---------------------------------------------------------------x

THE GOVERNMENT'S SENTENCING SUBMISSION

            PREET BHARARA
            United States Attorney for the
            Southern District of New York
            One St. Andrew's Plaza
            New York, New York 10007

Alvin Bragg
James Pastore
Assistant United States Attorneys
- Of Counsel -

The defendant was convicted after a jury trial of participating in a conspiracy to commit bank fraud, and he is scheduled to be sentenced on March 23, 2012. The Government respectfully files this submission in advance of the sentencing and in response to defense counsel's sentencing submission. The defendant seeks a sentence of "time served" – which would be approximately eight months' imprisonment – and bail pending appeal to press his claim that "[t]he wrong person was arrested and charged." The defendant's claim of innocence disrespects the jury's verdict and disclaims any responsibility for his criminal conduct. It also ignores the overwhelming evidence at trial, which included, among other things, several photographs of the defendant taken by bank surveillance cameras; two, separate in-court identifications of the defendant – one by a co-conspirator and the other by a bank employee; and multiple documents related to the fraud bearing the defendant's signature. The Government respectfully submits that a Guidelines sentence of 37 to 46 month's imprisonment is appropriate.[1] Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing, as it would reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

---

[1] As discussed below, the Probation Office calculated a Guidelines range of 46 to 57 months. That calculation was based upon information that the Government provided to the Probation Office concerning additional intended loss that was not addressed at trial. The Government now intends to rely at sentencing solely on the loss amount proven at trial.

## BACKGROUND

A.  **The Offense Conduct**

The evidence at trial established that the defendant opened three bank accounts into which stolen checks were deposited – one each at TD Bank, Citizens Bank, and Wachovia – and that the defendant attempted to open additional accounts for fraud at TD Bank. The basic scheme was straightforward: first, the defendant opened a bank account under the name of a fictitious company; the phony company's name was based on the name of a real company. That was because the next step involved depositing a stolen check – which was made out to the legitimate company – into the bank account. The similarity between the names of the phony company and the legitimate company was intended to fool the back into clearing the check. Once the stolen check cleared through the bogus account established by the defendant, the stolen funds were quickly withdrawn by the defendant and his co-conspirators.

As part of the scheme, the defendant adopted at least two fake identities that he used to open the accounts. He also took steps to establish bogus business entities, including by obtaining business certificates from New Haven, Connecticut in the name of the phony companies. In short, the defendant was an active and substantial participant at critical stages of the scheme, including the establishment of the accounts; the depositing of the stolen checks; and the ultimate withdrawal of the criminal proceeds.

One of the accounts the defendant opened was at TD Bank, on July 16, 2009, under the identity of "Mamadu Kamara" and in the name of a fictitious company named "Bollinger General Enterprises" (the "Bollinger Account"). (Presentence Investigation Report ("PSR") ¶ 12.) The defendant presented a driver's license bearing the name of "Mamadu

Kamara," (id. ¶ 12) and depicting the defendant (the "Kamara License"), and a trade name certificate bearing the name of "Bollinger General Enterprises." (Trial Transcript at 34-35.) Two photographs of the defendant opening the Bollinger Account were captured by a bank surveillance camera. (Id. at 36-37.)

On July 20, 2009, four days after the defendant opened the Bollinger Account, the defendant deposited a $75,031.08 check into the account that was made out to "Bollinger Incorporated," a legitimate company having no relationship with the defendant's fictitious Bollinger General Enterprises. (PSR ¶ 14.) A photograph of the defendant making this deposit was captured by a bank surveillance camera. ((PSR ¶ 26; Trial Transcript at 39.) One day later, the defendant cashed an $8,000 check that was made payable to "Mamadu Kamara." Two photographs of the defendant cashing this check were captured by a bank surveillance camera. (Trial Transcript at 40.) Within four days of the defendant fraudulently depositing the $75,031.08 check to Bollinger Incorporated, the following checks were drawn on the Bollinger Account:

- two $18,800 checks to Amadou Souare, a co-conspirator who identified the defendant at trial[2] and who testified at trial that he used the Kamara License to engage in fraud, (Trial Tr. at 118), and that, on several occasions, he accompanied the defendant to different banks for the purpose of having Kamara open fraudulent bank accounts or withdraw funds from fraudulent accounts, (PSR ¶ 16);

---

[2]Evidence other than Souare's testimony made clear that Souare and the defendant knew each other well. A law enforcement officer testified that he recovered from Souare a driver's license depicting the defendant. (Trial Tr. at 227.) Further, the same officer testified that, when he was arrested, the defendant gave, as his contact number, a phone number that was listed on documents maintained by the Federal Bureau of Prisons as a number that Souare called from prison months prior to the defendant's arrest. (Id. At 226-27.)

4

- a $20,600 check to Foday Sillah, the name that the defendant says is his true name; and

- an $8,000 check and an $8,700 check to Mamadu Kamara. (Id.)

A $43,846.48 check made payable to Bollinger, Incorporated was deposited on July 22, 2009, but it did not clear because payment was stopped due to a forged endorsement. (Trial Tr. at 42.)

Remarkably, even now, the defendant continues to deny that he ever used the name Mamadu Kamara (Def. Memo at 5). Yet, when law enforcement agents were arresting the defendant in his home and they asked for documents identifying the defendant, his wife pointed them to a drawer containing not only passports in what he claims is his true name, Foday Sillah, but also hospital discharge documents for "Kamrea Mamadu," clearly a misspelled version of the name the defendant claims not to have used. (Trial Tr. at 220-22.) Moreover, nearly half-a-dozen surveillance photographs captured the defendant opening the Bollinger Account in Kamara's name, depositing a check into it, and withdrawing money from it, directly contradicting the defendant's claim that "[n]o surveillance camera recorded the image of Sillah." Finally, one of the checks drawn on the bogus account – a check in excess of $20,000 – was made out to what even the defendant admits is his true name: Foday Sillah.

In addition to the Bollinger Account, the defendant attempted to open an account at TD Bank under another identity he adopted, "Moussa Sylla," as well as the phony business entities "Sylla Shipping," and "Sylla Shipping SEIU Local 32BJ." (Trial Tr. at 47.) In connection with these attempts, the defendant presented to a bank representative a Washington, D.C. driver's license in the name of "Moussa Sylla"[3] and trade name certificates for "Sylla

---

[3] Souare and a law enforcement officer testified that Souare had the Sylla License in his possession when he was arrested. (Id. ¶ 27; Trial Tr. at 134 - 36, 227.) Souare further testified

5

Shipping," and "Sylla Shipping SEIU Local 32BJ." (PSR ¶ 19; Trial Transcript at 47.) A particular bank employee assisted the defendant on three occasions at one TD Bank branch. (Id. at 47 - 55.) The first two occasions were on the same day, and the third was approximately one month later. (Id. at 47 - 51.) On the third occasion, the employee recognized the defendant to be the same person based upon his signature,[4] (id. at 47 - 52), and she declined to open an account for him because she believed that he was engaged in fraud, (id. at 55).

Having been prevented from opening an account at that TD Bank branch, the defendant moved on to another TD Bank branch location in an effort to continue the fraud. In fact, approximately one month later, the same bank employee saw the defendant twice attempting to open an account at a different TD Bank branch. (Id. at 55-57.) On one of these two times, the employee saw the defendant leave the bank and get into a red Audi, (id. at 57) – the very same type of car that Souare testified that he and the defendant used to go to a TD Bank to open an account, (Trial Tr. at 131). The bank employee who recognized the defendant in those separate TD Bank branch locations also recognized the defendant at trial and identified him in Court.

The evidence at trial also established that the defendant succeeded in opening at least two additional accounts, both on the same day: September 3, 2009. The defendant opened an account at Citizens Bank (the "Citizens Bank Account") in the name of "Sylla Shipping SEIU

---

that the license was fraudulent, as Sourae had extended the genuine license's expiration date. (PSR ¶ 22.) A representative of the Washington, D.C. Department of Motor Vehicles testified that the Sylla License was not genuine, and that the genuine Washington, D.C. license for Moussa Sylla had expired. (Trial Tr. at 83-84.)

[4]Law enforcement agents observed the defendant sign his fingerprint card after he was arrested. As the Government pointed out to the jury in its closing arguments, the signature on the fingerprint card very closely resembled the signature on several bank documents.

Local 32BJ," using a driver's license in the name of Moussa Sylla (the "Sylla License"). One day after the Citizens Bank Account was opened, an $88,468.62 check was deposited into the Citizens Bank Account. The check was made payable to SEIU Local 32BJ, a legitimate union having no relationship with the defendant's fictitious Sylla Shipping SEIU Local 32BJ. Souare testified at trial that the defendant and his co-conspirators did not withdraw any funds from the Citizens Bank Account, because they feared that the bank was aware of their fraudulent conduct. (Trial Tr. at 141.)

        The other account that the defendant opened on September 3, 2009 was at Wachovia Bank ("Wachovia Bank Account"), and it was under the names of "Moussa Sylla" and "Sylla Shipping SEIU Local 32BJ." (Trial Tr. at 64, 74.) The very next day, September 4, 2009, a $16,604 check made payable to SEIU Local 32BJ was deposited into the Wachovia Bank Account. (Id. at 70.) On September 18, 2009, a $8,815.86 check to Building Services 32BJ was deposited into the Wachovia Bank Account. (Id. at 74.) From September 9, 2009 to September 22, 2009, checks were written on the Wachovia Bank Account to Moussa Sylla (one of the defendant's aliases), Amadou Souare (the defendant's co-conspirator), and Foday Sillah (which even the defendant concedes is his true name). (Id. at 71 - 75.) Put another way, the evidence at trial established that checks drawn on at least two fraudulently opened bank accounts – accounts that were funded with stolen checks – were made payable to the defendant.

        In total, as discussed above and as set forth in the chart below, the intended loss amount established at trial was $232,766.04.

| Intended Loss Amount | Bank | Names Associated With Bank Account |
|---|---|---|
| $75,031.08 | TD Bank | Bollinger General Enterprises/Mamadu Kamara |
| $43,846.48 | TD Bank | Bollinger General Enterprises/Mamadu Kamara |
| $88,468.62 | Citizens Bank | Moussa Sylla/Sylla Shipping SEIU Local 32BJ |
| $16,604 | Wachovia Bank | Moussa Sylla/Sylla Shipping SEIU Local 32BJ |
| $8,815.86 | Wachovia Bank | Moussa Sylla/Sylla Shipping SEIU Local 32BJ |

That it was the defendant – and not some other individual – who engaged in the bank fraud discussed above was confirmed not only by Souare's trial testimony regarding the defendant's involvement, but also by the information Souare provided about other criminal conduct that he engaged in with the defendant. As the Court is aware from pre-trial conferences, Souare informed the Government that he and the defendant also engaged in a fraudulent tax-refund scheme. Specifically, the defendant gave Souare a driver's license and Social Security number, and Souare transferred that information to an individual who prepared phony tax returns.[5] Souare and the defendant planned to split the proceeds from the fraudulent tax return that would be generated by the filing.

Souare also told the Government that he and the defendant purchased at least two stolen cars that were then shipped out of the United States. Specifically, corrupt employees at car dealerships would drive the cars off the lot and later report the cars as stolen to the insurance companies. As part of the scheme, Souare and Kamara purchased a 2008 LandRover and a 2010 Toyota Tundra; Souare and Kamara were tasked with finding buyers for the cars.

---

[5] As noted above, the license the defendant provided to Souare was recovered from Souare at the time of his arrest.

B.       **The Presentence Investigation Report and Guidelines Calculation**

The United States Probation Office (the "Probation Office") calculated a total offense level of 23, (PSR ¶ 49), and a Criminal History Category of I, (PSR ¶ 52), resulting in a Guidelines range of 46 to 57 months' imprisonment, (PSR ¶ 74). The total offense level was based upon information the Government provided to the Probation Office that the intended loss amount was approximately $600,000. While the Government believes that the loss amount for the conspiracy was well in excess of $600,000, it does not seek to establish at sentencing that these additional losses are relevant conduct for the defendant under Section 1B1.3 of the Guidelines. Based upon the $232,766.04 intended loss amount established at trial, the defendant's total offense level is 21. The resulting Guidelines range is 37 to 46 months' imprisonment.

## DISCUSSION

A.       **Applicable Law on Sentencing**

The United States Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (ii) the four legitimate purposes of sentencing (which are described below), see id. § 3553(a)(2); (iii) "the kinds of sentences available," id. § 3553(a)(3); (iv) the Guidelines range itself, see id. § 3553(a)(4); (v) any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and (vii) "the need to provide restitution to any victims," id. § 3553(a)(7).  See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.     A Guidelines Range Sentence Is Appropriate**

A Guidelines sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  The offense is a serious one, and the defendant was an active and substantial participant.  The defendant repeatedly opened

bank accounts for the sole purpose of engaging in fraud. He did so using aliases complete with phony state-issued identification, and bogus corporate entities supported by business certificates. He deposited stolen checks into his accounts, inconveniencing the entities that were supposed to receive these funds – entities that included pension and benefits funds for employees of labor unions that represent, among others, building workers and janitors. The defendant then personally withdrew the criminal proceeds, causing significant financial harm.

Further, while the defense submission states that "[t]here is absolutely nothing in the Sillah family lifestyle to indicate [the] defendant obtained money by fraudulent conduct," (Def. Mem. at 4), the trial evidence is clear that the defendant benefitted significantly and directly from the fraud. Indeed, Souare testified about the defendant's receipt of $20,000 in cash from negotiating just <u>one</u> check. (Trial Tr. at 126) ("He looks very happy. He was actually very happy because I have the 18,000 and he has the 20,000.") In addition to this transaction, a number of checks were made payable to the defendant under the various aliases he adopted, and under his own name.

Although it is perhaps not surprising that, having gone to trial, the defendant now refuses to accept any responsibility for his criminal conduct, it is remarkable that, despite the overwhelming evidence, he persists in his claim of actual innocence. Indeed, he appears to ignore the record, asserting that there was no "surveillance camera" that recorded his image. The defendant's recalcitrance suggests a heightened need for deterrence in this case. That the defendant engaged in additional criminal conduct with Souare underscores that a Guidelines sentence is necessary to deter the defendant from committing still other crimes.

Accordingly, a Guidelines sentence would be sufficient, but not greater than necessary, to appropriately reflect the defendant's role in the conspiracy and the seriousness of his conduct, as well as to deter him from future criminal conduct.

**C.      Bail Pending Appeal Is Not Warranted**

The defendant seeks bail pending appeal. The relevant statute, 18 U.S.C. Section 3143(b), sets forth a two-step inquiry. Under the first step, bail is appropriate only if the Court finds, by clear and convincing evidence, that the defendant "is not likely to flee or pose a danger to the safety of any other person or the community." 18. U.S.C. Section 3143(b). This standard is the same standard set forth in Section 3143(a) for determining whether to grant bail pending sentencing. At the conclusion of trial, the Court remanded the defendant upon finding that he could not meet his burden as to the risk of flight. No circumstances warrant a departure from the Court's prior finding. The offense conduct involved the use of aliases on different forms of state-issued identification, the creation of fictitious corporate entities, and the alteration of a state-issued identification card. The defendant clearly has the know-how to change identities and, given that he faces a significant term of imprisonment and likely deportation, he has great incentive to use that know-how to flee.

The second step of the inquiry – which the Court need not reach – also weighs heavily in favor of the Government. Under the second step, bail is appropriate only if the Court finds that the defendant's appeal "is not for the purpose of delay and raises a substantial question of law or fact likely to result in" a reversal, a new trial, a sentence that does not include either any imprisonment or any imprisonment beyond the time already served by the defendant plus the expected time to complete the appeal process. 18. U.S.C. Section 3143(b)(1)(B). The defendant

points to <u>no</u> colorable issues for appeal.  Instead, he relies upon bald conclusions that ignore the trial record, such as "[n]o surveiallance camera recorded the image of [the defendant]," and an apparent, belated claim that the consensual search resulting in the discovery of the defendant's hospital discharge papers somehow violated the Fourth Amendment.

In sum, there is no colorable issue for appeal, and the Court should deny the defendant's request for bail for the same reasons that it previously remanded the defendant prior to sentencing.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s/_____
Alvin Bragg/James Pastore
Assistant United States Attorneys
Tel.: (212) 637-1085 / 2418